# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DOUGLAS ARLIE PUCKETT, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. CIV-14-301-W |
| | ) |
| JOE M. ALLBAUGH,[1] | ) |
| | ) |
| Respondent. | ) |

## REPORT AND RECOMMENDATION

Petitioner, appearing through counsel, seeks a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Am. Pet. (Doc. No. 7); Pet'r.'s Br. in Supp. (Am. Pet., Ex. 1 (Doc. No. 7-1)). United States District Judge Lee R. West has referred the matter to the undersigned Magistrate Judge for proceedings consistent with 28 U.S.C. § 636(b) (Doc. No. 3). Respondent has filed a Response (Doc. No. 12) and relevant state-court records (*see* Doc. No. 14), and Petitioner has filed a Reply (Doc. No. 15). After reviewing the pleadings, exhibits, and transcripts, the undersigned recommends that the Petition be denied.

## BACKGROUND

In 2009, in the District Court for Oklahoma County, Oklahoma, the State charged Petitioner with multiple crimes involving two children. Pet'r.'s Br. in Supp. at 3; *State of*

---

[1] The undersigned previously substituted Robert Patton as the sole Respondent. (Doc. No. 11). Now, the proper Respondent is Joe M. Allbaugh, the Oklahoma Department of Corrections' Director. *See* Fed. R. Civ. P. 25(d) (noting when a public officer "ceases to hold office when the action is pending" "[t]he officer's successor is automatically substituted as a party").

*Oklahoma v. Puckett*, No. CF-2009-1355 (Okla. Cnty. Dist. Ct.). Regarding the first child ("Ja.N."), Petitioner was tried on two counts of sexual abuse of a child (Counts 1, 2), two counts of forcible oral sodomy (Counts 15, 16), and two counts of attempted forcible oral sodomy (Counts 17, 18). Tr. Vol. I at 35-44.[2] Regarding the second child ("Je.N."), Petitioner was tried on six counts of sexual abuse of a child (Counts 4, 5, 6, 10, 11, 12). *Id.* Finally, relating to both children, Petitioner was charged with one count of engaging in a pattern of criminal activity (Count 25). *Id.*

The jury acquitted Petitioner on Counts 1, 2, 5, 10, and 11, but found him guilty on Counts 4, 6, 12, 15, 16, 17, 18, and 25. Am. Pet. at 1; Tr. Vol. VIII at 1515-18. Upon Petitioner's appeal, the Oklahoma Court of Criminal Appeals ("OCCA") affirmed the convictions. OCCA Summ. Op. (Resp., Ex. 3 (Doc. No. 12-3)) at 1-15. The OCCA subsequently denied Petitioner's motion for rehearing. OCCA Reh'g Order (Resp., Ex. 5 (Doc. No. 12-5)) at 1-3.

PETITIONER'S CLAIM

Ja.N. allegedly wrote a letter and gave it to his mother, Michelle Novotny, who was a co-defendant in the case against Petitioner. Ms. Novotny sought to introduce the letter at trial, but the trial court excluded it. In his only habeas claim, Petitioner alleges

---

[2] Citations to the parties' pleadings, briefs, and attached exhibits will refer to this Court's CM/ECF pagination. Citation to the trial transcripts will refer to the original pagination. Additionally, the undersigned has reprinted all quotations verbatim unless otherwise indicated.

this exclusion of Ja.N.'s "inconsistent and exculpatory statement" violated his federal constitutional right to present a defense. Am. Pet. at 5.[3]

THE RELEVANT FACTS ESTABLISHED AT TRIAL

Department of Human Services ("DHS") caseworkers investigated Petitioner and Ms. Novotny in 2006, 2007, 2008, and 2009, relating to the welfare of Ja.N. and Je.N.[4] The caseworkers testified that Ja.N. did not make any allegations of sexual abuse by Petitioner in the 2006, 2007, or 2008 investigations. Tr. Vol. II at 234 (2006 investigation); Tr. Vol. V at 824, 837-38 (2007 investigation), 950-51 (2008 investigation).[5] However, in January 2009, while being interviewed on a physical-abuse complaint against Petitioner, Ja.N. alleged for the first time that Petitioner had sexually abused him. Tr. Vol. IV at 759-61, 778-79; Tr. Exs., State's Ex. 18.

---

[3] In his brief, Petitioner suggests that the OCCA *also* violated his constitutional rights in the appellate process. Pet'r.'s Br. in Supp. at 2, 25-26. Petitioner does not explain this argument with sufficient clarity to permit its consideration and, in particular, fails to state a valid habeas claim that he was denied due process in the OCCA's disposition of Petitioner's appeal. *See Hatch v. State*, 58 F.3d 1447, 1460 (10th Cir. 1995) (rejecting claim that OCCA independently denied petitioner's due process rights in denying appeal); *Matthew v. Sirmons*, 146 F. App'x 295, 297 (10th Cir. 2005) (same).

[4] Because Petitioner's habeas claim involves his convictions on the charges related to Ja.N., the undersigned does not discuss the circumstances underlying the charges related to that child. Notably, however, although Petitioner asserts that he was acquitted on all charges related to Je.N., *see* Pet'r.'s Br. in Supp. at 4, he was in fact convicted on three charges (Counts 4, 6, and 25) naming Je.N. as a victim. Tr. Vol. I at 35-44; Tr. Vol. VIII at 1515-18.

[5] Ja.N. gave conflicting testimony on this issue. Initially, he testified that he first told someone about the sexual abuse several months before the preliminary hearing (which was held in May 2009), and that he did not tell DHS caseworkers about the sexual abuse during their 2006, 2007, and 2008 investigations involving allegations of physical abuse. Tr. Prelim. at 102, 123, 127-47. On cross-examination, Ja.N. conversely stated that he told every DHS worker about the sexual abuse, beginning in 2007. *Id.* at 162, 171.

When Ja.N. testified at preliminary hearing, he was eleven years old and suffering from a brain tumor. Tr. Prelim. at 71, 81. Ja.N. died before Petitioner's jury trial commenced in June 2011. At the trial, the State introduced Ja.N.'s recorded preliminary hearing testimony. Tr. Vol. V at 933-34. In that testimony, Ja.N. stated that: Petitioner was his mother's live-in boyfriend (Tr. Prelim. at 72-73); during the time Petitioner lived with them, Petitioner would put his hands "down in [Ja.N.'s] pants," inside his underwear, and would "directly touch[] his penis" (*id.* at 82-83); Petitioner asked him "to suck [Petitioner's] penis" (*id.* at 86-87); Petitioner at least twice "put his penis in [Ja.N.'s] mouth" (*id.*); and when this would happen Petitioner was usually wearing a bathrobe with no underwear, and Petitioner's penis would be "stiff" (*id.* at 88).

The State also showed the jury Ja.N.'s January 2009 recorded interview with Larry McAllister, then a forensic interviewer at the Child Advocacy Center. During that interview, Mr. McAllister and Ja.N. spoke extensively about Petitioner. Then, Mr. McAllister asked Ja.N. "has anyone ever touched you on your penis?" to which Ja.N. replied "yeah, he has." Tr. Exs., State's Ex. 18 at 9:47:24-28. Ja.N. told Mr. McAllister "he calls it playing, or something," and explained Petitioner would "reach down into my pants and touch it." *Id.* at 9:47:33-42. Ja.N. clarified that Petitioner would touch inside his pants, "on the skin," and would "wiggle it around." *Id.* at 9:47:54, 9:49:17-32.

Petitioner testified at trial, and denied that he ever touched Ja.N. inappropriately. Tr. Vol. VI at 1086-87. Petitioner specifically denied that he ever put his hand on Ja.N.'s penis or put his penis in Ja.N.'s mouth. *Id.* Petitioner argued during the trial that Ja.N. had either been coached to make false accusations, or had himself decided to make false

4

allegations so that he could live with his biological father. *Id.* at 1112, 1129; *see also* Tr. Vol. VII at 1453-54; Pet'r.'s Br. in Supp. at 4. Ms. Novotny argued, and testified to, the same theory. Tr. Vol. VI at 1220-21, 1223-24. To support this theory, Petitioner called Ja.N.'s pediatric oncologist, Dr. McNall-Knapp, to testify. According to Dr. McNall-Knapp, Ja.N. told her during an appointment that he had "messed up." Tr. Vol. VII at 1300. She told Ja.N. that "if somebody hit you or hurt you and you told, you did not mess up," to which Ja.N. replied, "no, I wanted to live with my daddy and instead I have to live with my grandma." *Id*.

During the trial, Ms. Novotny sought to introduce a letter purportedly written by Ja.N., which read:

> I turned you and doug into dhs because I sometimes want to live with my dad. and I would like to see my aunt Linda, cousins, and, nana and papa. You will not have to deal with dhs or me or my dad or nobody else because I will not have dhs come out anymore.

Tr. Exs., Def. Novotny's (proffered) Ex. B. The trial court, citing a lack of authentication, ordered the letter not be admitted into evidence. *See* Pet.'r's Br. in Supp. at 5.

As noted, relevant to the charges involving Ja.N., the jury found Petitioner guilty on two counts of forcible oral sodomy, two counts of attempted forcible oral sodomy, and one count of engaging in a pattern of criminal activity. Tr. Vol. VIII at 1515-18

5

## STANDARD OF REVIEW FOR HABEAS RELIEF

The Tenth Circuit has summarized the standard of review for evaluating state-court legal determinations challenged in federal court through a 28 U.S.C. § 2254 habeas proceeding:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we must apply a highly deferential standard in § 2254 proceedings, one that demands that state-court decisions be given the benefit of the doubt. If a claim has been "adjudicated on the merits in State court proceedings," we may not grant relief under § 2254 unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), refers to the holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision.
>
> Under the "contrary to" clause of § 2254(d)(1), we may grant relief only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts. And under the "unreasonable application" clause, we may grant relief only if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. An unreasonable application of federal law is different from an incorrect application of federal law. Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.

*Dodd v. Trammell*, 753 F.3d 971, 982 (10th Cir. 2013) (alterations, citations, and internal quotation marks omitted).

Thus, to succeed on a habeas petition under 28 U.S.C. § 2254(d)(1), "a state prisoner must show that the state court's ruling on the claim being presented in federal

court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Under § 2254(d)(2), in turn, the relevant question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Additionally, a federal habeas court must "accept a state-court [factual] finding unless it was based on 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) (citation omitted). In other words, when the state appellate court makes a factual finding, the Court presumes the determination to be correct; a petitioner can rebut this presumption only with clear and convincing evidence. *See id.* at 2199-2200; *see also* 28 U.S.C. § 2254(e)(1).

## ANALYSIS

Petitioner argues that the letter purportedly written by Ja.N. was "exonerating evidence" and its exclusion violated his federal constitutional right to present a defense. Pet'r.'s Br. in Supp. at 16, 18, 21-23. The improper exclusion of material evidence offered by a criminal defendant may amount to a violation of that defendant's constitutional rights. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690

7

(1986) (citations omitted). In evaluating Petitioner's habeas claim, the undersigned assumes that the failure to admit the letter at issue was constitutionally erroneous and, instead, focuses on the OCCA's conclusion that such error was harmless beyond a reasonable doubt due to the letter's limited probative value. *See* OCCA Summ. Op. at 3-9; OCCA Reh'g Order at 2.

    *A. The OCCA's Adjudication of Petitioner's Claim on its Merits*

In his direct appeal to the OCCA, Petitioner challenged the exclusion of the letter on the same or similar grounds as raised here. The OCCA rejected Petitioner's claim, holding:

> The "letter" is not addressed to anyone in particular and is undated. However, it is handwritten and signed with Ja.N.'s first name, and it appears to be intended for his mother, since it refers to "you and Doug." It is three pages long. The first page simply states, "I do not want to live with my dad." The second page is headed "Reasons for living w/ Mom & Doug" and lists fun things that the author gets to do with them, including going to museums, going on road trips, and going camping, swimming, *etc.* The letter states that the author likes the house and the garden and "really loves mom and dad even when dad Doug makes him mad." The second page concludes, "I want to live here because of these things." The final page of the letter states "Why I don't want to live with my dad: because I wouldn't get help with my homework and would always have scrapes and bruzes and wouldn't be helthy." In a separate paragraph, it then states: "I turned you and doug into dhs because I sometimes want to live with my dad and I would like to see my aunt Linda, cousins, and nana and papa." The final paragraph then states: "You will not have to deal with dhs or me or my dad or nobody else because I will not have dhs come out anymore." It is then signed with Ja.N.'s first name.
>
> The State has argued, in the trial court and on appeal, that the letter was inadmissible hearsay and was properly excluded by the trial court. The State also argued at trial that although the letter could possibly have been used to impeach Ja.N.'s (preliminary hearing) testimony, the defendants waived their right to do so, by failing to do so at the preliminary hearing – since everyone knew that Ja.N. was unlikely to be alive for any future trial

– and by failing to reveal the letter until the eve of trial. Nevertheless, the trial court clearly stated that it was excluding the letter because it could not be properly authenticated.

This Court finds that the letter should not have been excluded because it could not be properly "authenticated," since Michele Novotny was capable of testifying (and intended to testify) that she recognized the handwriting in the letter as that of her son and that the letter was indeed from him to her. Hence the trial court's reason for excluding the letter was incorrect, though this does not mean that the court's exclusion of the letter was necessarily incorrect.

This Court recognizes that the letter could potentially have been used to impeach Ja.N.'s testimony, since it suggests that Ja.N. had "second thoughts" about one of his reports to DHS. However, in the context of this particular case, it should have been brought up and used for this purpose at the time of Ja.N.'s preliminary hearing testimony, since the parties all understood that this would almost certainly be their one opportunity to question and cross-examine Ja.N.– and everyone expected that Ja.N.'s videotaped preliminary hearing testimony would be presented at trial, if the case ever went to trial. The record does suggest (though it does not conclusively establish) that the letter may possibly have been withheld for strategic reasons until the time of trial (perhaps by the defendants, without the knowledge of their attorneys).

This Court finds that Puckett has failed to show that the trial court abused its discretion by excluding the letter. The content of the letter reveals that its relevance regarding the crimes for which Puckett was actually on trial was quite limited. During one of the discussions about the letter in the trial record, the statement was made (and never countered) that the letter was received by Novotny after the first DHS investigation. The first DHS investigation involving an allegation of abuse of Ja.N. was in 2007, and this time period is consistent with the content of the letter. The letter indicates that Ja.N. was living with Novotny and Puckett when it was written and that Ja.N. wanted to stay with them and not his dad. Hence, the letter could not have been written after Ja.N. had accused Puckett of the sexual abuse crimes upon which Puckett was tried—since Ja.N. never returned to the home of Puckett and Novotny after January 11, 2009, and the first allegations that Puckett had inappropriately touched Ja.N. were made later that same month. Puckett was not tried on any charges of physically abusing Ja.N., and the only allegations involved in the early DHS investigations regarding Ja.N. were allegations of possible physical abuse.

This Court notes that although the letter may have had some relevance to suggest that Ja.N. had previously contacted DHS for reasons other than actual abuse (and then regretted doing so), the letter does not actually "recant" anything that Ja.N. may have reported to DHS. It does not state that anything Ja.N. reported to DHS was false or untrue, but rather that Ja.N. may have been motivated to contact DHS and "turn in" Novotny and Puckett because he sometimes wanted to live with his dad and see his other relatives (whom Novotny was apparently not allowing him to see). The letter does not amount to a clear admission that anything that Ja.N. reported to DHS was false; and due to its timing, it could not possibly have amounted to an admission that Ja.N. had made up the allegations of sexual abuse by Puckett.

This Court finds that in the specific circumstances of this case, the trial court's exclusion of the letter did not amount to a denial of Puckett's right to present a meaningful defense at trial. The circumstances of this case are not comparable to the circumstances of the cases relied upon by Puckett.

Puckett relies primarily upon *Williams* [*v. State*, 915 P.2d 371, 380-82 (Okla. 1996)], which states: "Where hearsay evidence is highly relevant to a critical issue in the case, and substantial reasons exist to assume the evidence is reliable, then the hearsay rule should not be used mechanically to defeat the ends of justice." This Court concludes that the letter at issue does not qualify as "highly relevant to a critical issue in the case" and that the ends of justice in the current case were not defeated by the exclusion of the letter (either on hearsay grounds or by the incorrect ruling that it could not be "authenticated"), for all the reasons already discussed. This Court further finds that any possible error in excluding this letter was harmless beyond a reasonable doubt, especially because the letter was not written after Ja.N. had accused Puckett of sexually abusing him − and certainly did not amount to any kind of "recantation" of these allegations.

This Court further notes that the defense did present the testimony of Dr. Rene McNall-Knapp at trial, who was Ja.N.'s primary pediatric oncologist from the time he was first diagnosed with a brain tumor (in December of 2004), until his death in August of 2009. Dr. McNall-Knapp testified that she saw and examined Ja.N. frequently during this time and that she never had any concerns or "suspicion" that he was being abused, either physically or sexually. She testified that both Novotny and Puckett were very attentive to Ja.N.'s care, did a good job taking care of him, and seemed to have a good relationship with Ja.N.

> Dr. McNall-Knapp also testified that after she became aware that Ja.N. was no longer living with Novotny and Puckett and that allegations of abuse had been made, she talked to Ja.N. and asked him about it. She testified:
>
>> I asked him, "baby, what happened?" You know, because at this point I had known Ja.N. for three-and-a-half, four years, and I asked him what happened and he looked at me and said, "I messed up." And I said, "honey, if somebody hit you or hurt you and you told, you did not mess up. That is what you're supposed to do." And he said, "no, I wanted to live with my daddy and instead I have to live with my grandma."
>
> Dr. McNall-Knapp testified that the conversation was very memorable to her, particularly Ja.N.'s statement that he had "messed up." She acknowledged on cross-examination, however, that Ja.N. never said that he had lied about the allegations he had made.
>
> This Court finds that Dr. McNall-Knapp's testimony about Ja.N.'s statement that he had "messed up" was much more relevant and supportive of Puckett's defense at trial, i.e., that Ja.N. made up the allegations of sexual abuse in order to be placed with his dad, than the letter that was excluded; and the jury was allowed to hear and fully consider this testimony without any objection from the State. Furthermore, Defendant Puckett, whose attorney at the time of Ja.N.'s preliminary hearing testimony was still his attorney at trial, has never offered any persuasive reason why the letter from Ja.N. was not raised and used to impeach him at the time of his preliminary hearing testimony. This Court finds, once again, that any possible error in excluding the letter was harmless beyond a reasonable doubt.

OCCA Summ. Op. at 3-9 (internal brackets and citations omitted).

In his motion for rehearing, Petitioner argued that the OCCA ignored his claim that he only learned of the letter one week before trial, and thus could not have questioned Ja.N. about the letter during the preliminary hearing. Resp., Ex. 4 (Doc. No. 12-4) at 1-5. The OCCA denied the motion for rehearing, holding:

> Puckett argues that . . . this Court misunderstood the record concerning a letter written by the deceased victim. This Court thoroughly reviewed the entire record, as well as the applicable law, in reaching its conclusions. We concluded . . . that the trial court did not abuse its discretion in refusing to admit the letter, and any possible error in that decision was harmless beyond a reasonable doubt, because the letter had little relevancy to the issues at trial. When the letter may have been discovered has no bearing on that conclusion. No question decisive to the case was overlooked.

OCCA Reh'g Order at 2.

Vital to his underlying arguments, Petitioner interprets the direct appeal opinion as agreeing that the trial court erred in refusing to admit the letter, but holding the error was harmless only because Petitioner could have addressed the letter during preliminary hearing. Pet'r.'s Br. in Supp. at 5, 14, 22; Pet'r.'s Reply at 1-4. Respondent disagrees, noting in relevant part that the OCCA held the alleged error was harmless because the letter was irrelevant. Resp. at 7-12.

The undersigned concludes that the OCCA adjudicated Petitioner's claim on its merits by applying the harmless error standard of *Chapman v. California*, 386 U.S. 18, 24 (1967), and holding that "any possible error in excluding the letter was harmless beyond a reasonable doubt" based on the letter's general irrelevance to the sexual-abuse charges.[6] OCCA Summ. Op. at 9. It did so in the following paragraphs:

---

[6] Petitioner strenuously argues that the OCCA "changed [its] rationale," first holding that the letter was relevant for impeachment, then, in denying rehearing, holding that the letter was irrelevant. Pet'r.'s Br. in Supp. at 22-23, 25; Pet'r.'s Reply at 2-3. Petitioner misreads the OCCA's opinion. In the direct appeal opinion, the OCCA held the letter "could potentially have been used to impeach Ja.N.'s testimony" but that its "relevance regarding the crimes for which Puckett was actually on trial was quite limited." OCCA Summ. Op. at 5-6. Then, denying rehearing, the OCCA simply reiterated that "the letter

12

>    This Court notes that although the letter may have had some relevance to suggest that Ja.N. had previously contacted DHS for reasons other than actual abuse (and then regretted doing so), the letter does not actually "recant" anything that Ja.N. may have reported to DHS. It does not state that anything Ja.N. reported to DHS was false or untrue, but rather that Ja.N. may have been motivated to contact DHS and "turn in" Novotny and Puckett because he sometimes wanted to live with his dad and see his other relatives (whom Novotny was apparently not allowing him to see). The letter does not amount to a clear admission that anything that Ja.N. reported to DHS was false; and due to its timing, it could not possibly have amounted to an admission that Ja.N. had made up the allegations of sexual abuse by Puckett.
>
>    This Court concludes that the letter at issue does not qualify as "highly relevant to a critical issue in the case" and that the ends of justice in the current case were not defeated by the exclusion of the letter (either on hearsay grounds or by the incorrect ruling that it could not be "authenticated"), for all the reasons already discussed. This Court further finds that any possible error in excluding this letter was harmless beyond a reasonable doubt, especially because the letter was not written after Ja.N. had accused Puckett of sexually abusing him − and certainly did not amount to any kind of "recantation" of these allegations.

OCCA Summ. Op. at 6-7. Further, the OCCA clarified its holding when it denied Petitioner's motion for rehearing, stating:

>    We concluded . . . that the trial court did not abuse its discretion in refusing to admit the letter, and any possible error in that decision was harmless beyond a reasonable doubt, because the letter had little relevancy to the issues at trial. When the letter may have been discovered has no bearing on that conclusion.

OCCA Reh'g Order at 2. The undersigned reviews the OCCA's holding in that light.[7]

---

had little relevancy to the issues at trial." OCCA Reh'g Order at 2. The undersigned sees no inconsistency.

[7] To that end, the undersigned does not address Petitioner's extensive argument regarding whether the OCCA reasonably found that he should have introduced the letter during the preliminary hearing. Pet'r.'s Br. in Supp. at 21-23.

13

*B. Habeas Review of State Court Finding of Harmless Error*

When a state appellate court has determined—consistent with the *Chapman* standard—that a federal constitutional error is harmless beyond a reasonable doubt, both AEDPA's § 2254(d) and the "actual prejudice" requirement first articulated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), impel that deference be given to the state court's decision. *See Davis*, 135 S. Ct. at 2198-99. The "federal habeas court need not formally apply both" tests because "the *Brecht* standard subsumes the requirements that § 2254(d) imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." *Id.* at 2198 (quotation marks omitted). The Supreme Court summarized the standard to be applied as follows:

> When a *Chapman* decision is reviewed under AEDPA, a federal court may not award habeas relief under § 2254 unless *the harmless determination itself* was unreasonable. And a state-court decision is not unreasonable if fairminded jurists could disagree on its correctness. [A federal habeas petitioner] therefore must show that the state court's decision to reject his claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 2198-99 (citations, quotation marks, and brackets omitted).

*C. The OCCA's Factual Findings*

In applying this standard, the Court additionally owes deference to the OCCA's factual finding that Ja.N. wrote the letter at issue *before* he accused Petitioner of sexual abuse. This factual finding is critical because Petitioner was not tried on the allegations of physical abuse—only sexual abuse. If Ja.N. wrote the letter before he accused

14

Petitioner of sexually abusing him, then the letter's contents cannot be interpreted as a recantation of those accusations.

According to the OCCA, Ja.N. wrote the letter while he was still living in Petitioner and Ms. Novotny's home, and Ms. Novotny received it after the first DHS investigation. OCCA Summ. Op. at 6. The OCCA noted that: DHS first investigated allegations of physical abuse involving Ja.N. in 2007; DHS removed Ja.N. from Petitioner and Ms. Novotny's home in early January 2009, after he had made an allegation of physical abuse against Petitioner; and Ja.N. made his allegations of sexual abuse later that month. *Id.* According to the OCCA, because Ja.N. never returned to Petitioner and Ms. Novotny's home after January 2009, he had to have written the letter *before* he made the sexual-abuse allegations. *Id.*

As discussed above, this Court must accept these factual findings and presume them to be correct unless Petitioner presents clear and convincing evidence to rebut that presumption. 28 U.S.C. § 2254(e)(2). The undersigned finds Petitioner fails in this respect.

Petitioner relies on the alleged *lack of evidence* to support his claim, arguing "there is nothing in the record that shows when the letter was written or delivered to the Petitioner's co-defendant . . . ." Pet'r.'s Reply at 7. To this end, Petitioner criticizes the OCCA because it "did not hold an evidentiary hearing." Pet'r.'s Br. in Supp. at 24; Pet'r.'s Reply at 7-9. This argument ignores that it is Petitioner's obligation in this Court to produce clear and convincing evidence to rebut the presumption of correctness. *See Stouffer v. Trammell*, 738 F.3d 1205, 1211 (10th Cir. 2013) ("Mr. Stouffer does not offer

clear and convincing evidence that the OCCA's factual conclusions about the crime are erroneous. We therefore presume them to be correct.").

Moreover, the record supports the OCCA's findings. At trial, the State told the trial court: "I was told by defense counsel that they, that Ms. Novotny had [the letter] since the first investigation, . . . which I assume would have been 2006 or 2007 . . . ." Tr. Vol. VI at 1204; *accord* OCCA Summ. Op. at 6 ("During one of the discussions about the letter in the trial record, the statement was made (and never countered) that the letter was received by Novonty after the first DHS investigation. The first DHS investigation involving an allegation of abuse of Ja.N. was in 2007, and this time period is consistent with the content of the letter."). Then, when Ms. Smith, Ms. Novotny's defense counsel, asserted the letter had not been intentionally withheld, the State noted: "I intimated there was bad faith on the part of the Defendants not defense counsel, and [Petitioner's defense attorney] Ms. Viol did tell me when I asked her, I don't think Ms. Smith was there, that she thought . . . I asked when did he write this and she said it was after the first DHS investigation." Tr. Vol. VI at 1205, 1207. Although Ms. Smith insisted that she had not had the letter in her possession, neither defense attorney disputed the State's assertion that Ja.N. had written the letter in 2006 or 2007. *Id.* at 1204-07. Additionally, Petitioner in his brief in this Court cites testimony suggesting Ja.N. wrote the letter *before* the 2009 allegations of sexual abuse. *See* Pet'r.'s Br. in Supp. at 12. Discussing Ms. Novotny's testimony, Petitioner interprets it to say that she told Ja.N. in 2008 that he could go live with his father, and "[i]t was at this point that Ja.N. gave her the letter in question apologizing for talking to DHS." *Id*.

In light of this record, Petitioner has not met his burden of producing clear and convincing evidence to rebut the presumption of correctness owed to the OCCA's factual findings. Further, to the extent that Petitioner is requesting an evidentiary hearing in this Court, he has not shown he is entitled to one. First, in accordance with 28 U.S.C. § 2254(e)(2)'s diligence requirement, a federal evidentiary hearing is not permitted unless the petitioner "show[s] that he made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court in the manner prescribed by state law." *Milton v. Miller*, 744 F.3d 660, 672-73 (10th Cir. 2014); 28 U.S.C. § 2254(e)(2). Here, there is no indication in the record that Petitioner asked for an evidentiary hearing during the state court proceedings. And Petitioner did not challenge the OCCA's factual findings as to when the letter was written. *See* Resp., Ex. 4 (challenging the OCCA's factual finding regarding when he *discovered* the letter, but not the finding on when the letter was *written*). Second, even if Petitioner had shown the requisite diligence under § 2254(e)(2), he is not entitled to an evidentiary hearing unless "his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Williams v. Trammell*, 782 F.3d 1184, 1218 (10th Cir. 2015). When evaluated against the record set forth above, Petitioner's limited statements concerning the date of writing of the letter at issue do not reasonably indicate that he can prove by clear and convincing evidence that the OCCA's finding was incorrect.

### D. Actual Prejudice

Accepting that Ja.N. wrote the letter at issue before he reported Petitioner for sexual abuse, the OCCA's determination that the trial court's exclusion of the letter was

17

harmless is reasonable application of the *Chapman* standard. As the OCCA noted, Ja.N. did not actually recant any allegations in the letter; instead, he simply indicated a motivating factor for contacting DHS on at least one occasion. Further, even if the letter could be interpreted as recanting any allegations made to DHS, it could only cast doubt on the allegations of *physical abuse* that preceded the letter's writing—and not the allegations of sexual abuse that came later.

And, as noted by the OCCA, to the extent Petitioner wished to use the letter to show *merely as a general proposition* that Ja.N.'s reporting of events might have been motivated by something other than the truth, the probative value of the letter paled in comparison to other evidence that was admitted but presumably not believed. Dr. McNall-Knapp testified that Ja.N. seemed to express some regret for reporting Petitioner and Ms. Novotny to DHS, and both Petitioner and Ms. Novotny testified as to why Ja.N. might have made false allegations of sexual abuse.

For these reasons, Petitioner has not shown that the OCCA's determination that the exclusion of the letter was harmless "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Davis*, 135 S.Ct. at 2199. Accordingly, Petitioner has not established that he was "actually prejudiced" by the exclusion of that proffered evidence. *Id.* The Petition should be denied.

## RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Mr. Puckett's petition for writ of habeas corpus be DENIED.

18

## NOTICE OF RIGHT TO OBJECT

The undersigned advises the parties of their right to object to this Report and Recommendation no later than August 24, 2016, under 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). The undersigned further advises the parties that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal issues contained herein. *See Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation disposes of all matters referred to the undersigned Magistrate Judge and terminates the referral.

ENTERED this 3rd day of August, 2016.

_____
CHARLES B. GOODWIN
UNITED STATES MAGISTRATE JUDGE